IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| CRAIG R. BORRELLI, | ) | |
| | ) | Civil Action No.06-869 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| METAL TRADERS, INC. d/b/a | ) | |
| TRIAD METALS INTERNATIONAL | ) | |
| | ) | |
| Defendant, | ) | |


## <u>MEMORANDUM OPINION</u>

CONTI, District Judge

Pending before this court is a motion for summary judgment (Docket No. 37) filed by

defendant Metal Traders, Inc. d/b/a Triad Metals International ("Triad" or "defendant").  Plaintiff

Craig R. Borrelli ("plaintiff" or "Borrelli") in his complaint asserts several claims against Triad:

1) claims for disability discrimination under the Americans with Disabilities Act ("ADA"), 42

U.S.C. §§ 12101 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS.

STAT. § 955 and 2) claims for age discrimination under the Age Discrimination in Employment

Act, 29 U.S.C. §621 et seq. ("ADEA"), and the PHRA, 43 PA. CONS. STAT. § 954(b).  Plaintiff

asserts that Triad wrongfully terminated him from a position for which he was qualified because

the defendant regarded him as disabled.  Plaintiff claims the decision to terminate his employment

was also based on age discrimination because he was forty-two years old at the time and was

replaced by a twenty-eight-year-old with similar employment experience.  After reviewing the

record, viewing all disputed facts in plaintiff's favor and drawing all reasonable inferences in

plaintiff's favor, the court concludes that because there are genuine issues of material fact in dispute for each claim, defendant's motion for summary judgment will be denied.

### *Factual Background Viewing Disputed Facts in Plaintiff's Favor*

**Plaintiff 's Early Employment**

#### a.  Background and Training

In August 2001, plaintiff began his employment with Triad as the Neville Island Warehouse Manager ("Neville Island Manager").  (Plaintiff's Deposition ("Pl.'s Dep.") at 32:5-6, 33.)  Triad is a structural steel wholesaler headquartered in Willow Grove, PA with warehouses and transportation operations in two locations:  Neville Island, PA (the "Neville Island warehouse") and Petersburg, VA (the "Petersburg warehouse").  (Declaration of Ron Hammond ("Hammond Dec.") ¶ 3.)  As the Neville Island Manager, plaintiff oversaw the operations of the Neville Island warehouse: a large structure which houses steel product. (Joint Statement of Undisputed Material Facts ("J.S.") ¶ 6.)  Outside the Neville Island warehouse is an adjacent four-acre yard ("Yard") for storage of over-flow and customer-specific steel product.  (Hammond Dec. ¶ 4.) Approximately 204,000 tons of steel are processed in and out of the Neville Island warehouse annually, with a sales volume of approximately $90 million.  (Hammond Dec. ¶ 9.)  In addition to the steel,  machinery is housed within the Neville Island warehouse and is used to unload, load, move, cut or otherwise process steel.  (Id.)  During the period of plaintiff's employment as the Neville Island Manager, Triad had approximately $850,000 invested in machinery, including cranes, saws, forklifts, and hand tools.  (Declaration of James Benner ("Benner Dec.") ¶ 5.)

The Neville Island warehouse staff consisted of:  (1) the Neville Island Manager; (2) one foreman for each of the three shifts; and (3) Neville Island warehouse employees who perform the

shipping, receiving, processing and machinery operating functions. (Hammond Dec. ¶ 16.) The first-shift and second-shift foremen during plaintiff's tenure were Gary Ritson ("Ritson") and Frank Rimer ("Rimer"). (Pl.'s Dep. at 36:14-25, 38:17-24; Hammond Dec. ¶ 16.) Ron Hammond ("Hammond") is the CEO and founder of Triad and was plaintiff's direct supervisor throughout his employment. (Hammond Dec. ¶ 1.) During his employment, plaintiff also interacted with his counterpart, Petersburg warehouse manager Dennis McGovern ("McGovern"), who oversaw the Petersburg warehouse in Petersburg, VA. (Hammond Dec. ¶ 8.)

Hammond and McGovern claim to have provided plaintiff with extensive training. Plaintiff stated that at the beginning of his employment Hammond gave him direction on a regular basis. (Affidavit of Craig R. Borrelli ("Pl.'s Aff.") ¶ 6.) Plaintiff also stated that any initial advice he received from McGovern came from informal conversations rather than formal training. (Pl.'s Aff. ¶ 7.) Most of plaintiff's training was conducted by the former warehouse manager, Lou Paliani ("Paliani"), who trained plaintiff for a couple of weeks at the beginning of his employment. (Id.) Plaintiff, however, stated that he never received any formal training. (Pl.'s Aff. ¶ 6.)

### b. Plaintiff 's Duties as Neville Island Manager

Plaintiff's duties as the Neville Island Manager included supervising his direct reports, suggesting improvements for efficiency, managing inventory, maintaining the integrity of the steel, maintaining the safety of the facilities and machinery, overseeing incoming and outgoing shipments, and providing support to the sales department. (J.S. ¶ 21.) Plaintiff's supervisory duties included evaluating the performance of his direct reports, scheduling, and ensuring that his direct reports correctly and safely operated the equipment. (Pl.'s Dep. at 39:14-22, 40:14-20, 41:8-

11, 58:19-23; McGovern Dec. ¶ 11.) Plaintiff's responsibilities regarding inventory management included ensuring the accuracy and quality of all shipments. (Pl.'s Dep. at 62:24-63:7.) Specifically, plaintiff was responsible for ensuring that materials were properly recorded, put away, and shipped. (Id.) Plaintiff was also responsible for maintaining the integrity of the steel during unloading, moving, organizing, storage, processing and loading. (Pl.'s Dep. at 68:24-69:9; Hammond Dec. ¶ 32.) Plaintiff's safety responsibilities included ensuring the safety of employees, customers, visitors, and personnel. (Pl.'s Dep. at 43:7-11, 44-13-20, 46:23-47:1, 57:3-11; McGovern Dec. ¶ 13-15; Benlock Dec. ¶ ¶ 8-9; Gibson Dec. ¶ 5; Hammond Dec. ¶ 33.)

Triad held plaintiff responsible for the maintenance of the entire Neville Island warehouse structure, including the roof, walls, bathroom, break room, and tool room. (Pl.'s Dep. at 43:17-21, 44:10-12, 44:21-22, 196:16-197:5; McGovern Dec. ¶ 15; Benlock Dec. ¶ 10.) Plaintiff was also required to maintain the Neville Island warehouse equipment and machinery by overseeing periodic maintenance, inspection, and repair of all machinery and equipment. (Pl.'s Dep. at 47:10-22, 48:23-49, 50:16-51:3, 52:4-10, 53:4-54:2, 54:5-12, 54:17-56:9, 56:23-58:11; Hammond Dec. ¶¶ 34-35; Declaration of Michael Benlock "(Benlock Dec.") ¶ 11; McGovern Dec. ¶ 13.)

Plaintiff's role in managing the supply of steel in the warehouse required plaintiff to ensure the efficient flow of the Neville Island warehouse operations through scheduling and overseeing inbound and outbound shipments. (Pl.'s Dep. at 152:14-153:5-20, 157:18-158:7; McGovern Dec. ¶¶ 5, 16; Hammond Dec. ¶¶ 37-38; Declaration of Scott Lynch ("Lynch Dec.")¶ 8; Rimer Dec. ¶ 6; Ritson Dec. ¶ 6; Gibson Dec. ¶¶7-8; Pl.'s Aff. ¶ 12.) By monitoring outgoing shipments, plaintiff was responsible for ensuring that outgoing shipments accurately reflected customer orders and that no damaged steel was shipped to customers. (Pl.'s Dep. at 43:24-25, 44:3-9,

69:10-70:10, 70:24-71:20; McGovern Dec. ¶¶ 3, 17; Benlock Dec. ¶¶ 3, 7, 12; Lynch Dec. ¶ 7;

Gibson Dec. ¶ 4.)  Plaintiff interacted with and provided support to the sales department by timely

providing guidance to the sales force regarding inventory and capabilities (Lynch Dec. ¶¶ 3-5;

Lynch Dec. Ex. A; Declaration of Ron Maltin ("Maltin Dec.") ¶¶ 3-4.)

**Allegations Regarding Plaintiff's Deficient Performance**

### a.  Background

In early 2003, Ritson and Rimer complained to Hammond about plaintiff's performance.

(Hammond Dec. ¶¶ 41-42.)  Hammond stated that subsequently he began to visit the Neville

Island warehouse regularly and actively to seek feedback from his management team regarding

plaintiff's performance. (Id.)  According to Hammond, this feedback revealed deficiencies in

plaintiff's performance. (J.S. ¶ 23.) Plaintiff stated that he did not see Hammond on a regular

basis at the Neville Island warehouse, and denied the existence of an ongoing investigation of

plaintiff's performance. (Id.)

### b.  Defendant's Allegations

Defendant identified the following deficiencies with respect to plaintiff's work performance:

(1) failure to supervise because plaintiff arrived to work late and left work early; (2) failure to

contribute to business operations because plaintiff fell asleep in a meeting; (3) failure to manage

properly the inventory; (4) failure to maintain the integrity of the steel product; (5) failure to

maintain a safe Neville Island warehouse and Yard because plaintiff left debris in the Yard that

could cause dangerous conditions and because he allowed silt to buildup in the channel which

disrupted barge traffic; (6) failure to maintain the Neville Island warehouse structure; (7) failure to

maintain the Neville Island warehouse equipment and machinery; (8) failure to manage properly

the flow of operations at the Neville Island warehouse; (9) failure to manage properly incoming and outgoing shipments – specifically, failing to ensure the quality of the material shipped which resulted in customer complaints. (J.S.¶¶ 23(a) - (i); Pl.'s Dep. at 129:3-13.)

The final alleged deficiency was plaintiff's failure to interact properly with the sales department. (J.S.¶ 23(j).) During plaintiff 's employment, Triad installed a new phone and data line system and provided plaintiff with a cell phone. (Id.) Triad contends that the new communication equipment was put in place to attempt to remedy plaintiff 's failure to communicate with the sales department. (Hammond Dec. ¶¶ 75-77; Benner Dec. ¶ 6.) Plaintiff stated that these systems were necessary improvements to the facility and were not put in place to correct any alleged deficiencies with respect to plaintiff's performance. (Pl.'s Dep. at 187:5-13.)

### c. Plaintiff 's Performance

Plaintiff admitted to certain performance problems that occurred in the spring of 2003 when his prescription drug use inhibited his work performance. (J.S. ¶ 23-23(j).)  In the spring of 2003, plaintiff fell asleep during a meeting.  (J.S. 23(b); Pl.'s Dep. at 129:3-13.)  Plaintiff and his wife discussed this incident with Hammond. (J.S. ¶ 71.)  Plaintiff apologized to Hammond and quit taking the medication.  (J.S. ¶ 74.)  A month or two after plaintiff quit using the medication, Hammond told plaintiff that he had intended on firing him, but chose not to because of a conversation with one of the salesmen, Scott Lynch, who stated, "what would you want to fire him now for, he is doing a great job."  (Pl.'s Dep. at 148:18-21.)  By the end of 2003, plaintiff was receiving favorable performance feedback once again. (Id. at 265:6-12.)

Plaintiff did not receive any unfavorable reports about his work until 2003. (J.S. ¶¶ 23(a)-(j).)  A memorandum co-authored by Hammond dated July 8, 2002 stated:

Dear Craig,

I would like to take this opportunity to thank you for all your hard work.  The first six months of this year has been a more difficult challenge due to the poor economy and the integration of our Petersburg facility.  As a company we have been profitable every month this year.  The mid year bonus represents what Triad is doing better than our competitors.

In "2002" numerous steel distributors have cut back on their labor force, shut down unprofitable facilities, eliminated all employee benefits and in many cases filed bankruptcy.  With the exception of setting limits on company contribution of medical benefits Triad continues to fully support life & disability insurance and 401K matching contributions.  As a company we continue to step up to the plate because our employees join management on the front lines.

Profit is the driving force influencing our year end piece of the pie.  Hopefully, the remainder of the year will bring continued growth and prosperity to Triad Metals.  Fred & I look forward to year-end and sharing with our team members the fruits of our labor.

Once again, **THANK YOU**.

Sincerely,

Ron & Fred

(J.S. ¶ 22) (emphasis in original).   A request for verification of employment completed on August 13, 2003 by James Benner, controller for Triad, stated that Borrelli's "probability of continued employment was excellent." (J.S. ¶ 22.)  Triad noted on the August 13, 2003 request for verification of employment that "[it] is expected that Craig Borrelli's bonus for 2003 should equal [the] bonus given for 2002." (Pl.'s Ex. C.)  Plaintiff received a raise in 2003 of an equal percentage and in a greater dollar amount than the one he received in 2002. (J.S. ¶¶ 22, 24.)

In May 2003, McGovern told plaintiff's wife, Diana Borrelli, that the warehouse looked great and that plaintiff was doing well on the job.  (Affidavit of Diana Borrelli ("D. Borrelli Aff.") ¶ 21.)  In December 2003, Hammond met with plaintiff and noted how much plaintiff had improved

since early 2003. (Pl.'s Dep. at 265:6-12.) Hammond explained that if plaintiff kept up the good work during the next year, they would discuss the possibility of plaintiff attaining part of the ownership of Triad. (Pl.'s Dep. at 265:6-15.) Hammond had previously explained that after four years of employment if a manager did a good job, the manager would be considered for a share in the partnership. (Pl.'s Dep. at 265:16-266:1.) Also in December 2003, plaintiff and his wife attended a Christmas party at Hammond's home. (D. Borrelli Aff. ¶ 18.) During the party, Hammond told plaintiff's wife that plaintiff was doing well, and that if plaintiff continued as he was, he would be a partner in no time. (D. Borrelli Aff. ¶ 19.)

**Hammond's Alleged Decision to Terminate Borrelli**

Hammond stated that based upon plaintiff's alleged performance deficiencies, Hammond made the decision around November 2003 to terminate plaintiff. (Hammond Dec. ¶ 85; Hammond Dep. at 60:16-23.) Hammond stated that at that time he informed three management-level employees of his decision: McGovern, Maltin, and Lynch. (Hammond Dec. ¶ 85; McGovern Dec. ¶ 27; McGovern Dep. at 38:19-22; Maltin Dec. ¶ 14; Maltin Dep. at 22:2-9; Lynch Dec. ¶ 9; Lynch Dep. at 14:23-15:7.)

Hammond states that as a business practice he does not terminate employees during the holiday season. (Hammond Dec. ¶ 86.) For this reason, Hammond decided to wait until after the holiday season to execute his decision to terminate plaintiff. (Hammond Dep. at 60:16-23.) Hammond claims that in waiting to terminate plaintiff, he showed compassion for plaintiff and his family. (Hammond Dec. ¶ 86.) While plaintiff was at home recovering from surgery, he, however, received daily telephone calls from Triad employees concerning work related questions. (Pl.'s Dep. at 242-243.) During one call, when Hammond learned plaintiff was out walking,

Hammond commented, "I wish I had time to walk." (Pl.'s Ex. E ¶ 7.) At another time, when plaintiff explained that heart patients sometimes experience depression, Hammond suggested that if he were such a patient he would be "out chopping wood." (Id.)

**Plaintiff's Heart Surgery and Incremental Return to Work**

On January 16, 2004, Plaintiff underwent coronary bypass surgery. (J.S. ¶ 34.) Plaintiff was released from the hospital four days after the surgery. (Id.) While plaintiff was out of work until February 23, 2004, Triad paid him full-time during this period, despite not being obligated to do so. (Id.) Plaintiff returned to work full-time with no restrictions on his physical activity. (Id.) A few days after his return to work, plaintiff informed Hammond that he could only work four hours per day based on his doctor's orders. (Id.) Plaintiff worked a time-restricted schedule until approximately mid-May 2004, although there were no restrictions on what he could do during this time. (J.S. ¶ 35.) Triad continued to pay plaintiff his full salary during this time period. (Id.)

On April 24, 2004, plaintiff was readmitted to the hospital because he was not feeling well. Plaintiff was released the next day. (Pl.'s Dep. at 11:18-13:23, 250:2-9, 252:20-253:1.) Plaintiff requested and was granted a week off from work to recover. (J.S. ¶ 36.) Plaintiff asked Hammond if he could take the time off as vacation. (Id.) Hammond indicated the vacation time was approved. (Id.) On May 3, 2004, when plaintiff returned to work, Hammond called him into his office and accused plaintiff of "screwing the company." (Id.) Hammond informed plaintiff that he had spoken with two nurses regarding plaintiff's condition and that the nurses had advised him that generally a patient having undergone plaintiff's type of surgery should have been able to return back to work full-time one month after the surgery. (Pl.'s Dep. at 29:6-23; Pl.'s Ex. E ¶ 2.) Hammond informed plaintiff that from that time forward he would only be paid for his time

worked. (Hammond Dec. ¶ 93.) Plaintiff never received vacation pay for the week he requested off. (Pl.'s Ex. E ¶ 2.) Plaintiff presented a doctor's note, dated May 3, 2004, and reported that he was able to work full-time without any restrictions. (Hammond Dec. ¶ 93.)

**Borrelli's Actual Termination**

Around June 2004, Hammond purchased new equipment scheduled to be delivered later in the summer including a Kaltenbach cold saw and material handling equipment. (Hammond Dec. ¶ 100; Benner Dec. ¶ 15.) Hammond asserted that he was unable to trust plaintiff to maintain this equipment. (Hammond Dec. ¶ 100.) Hammond allegedly decided to terminate plaintiff based upon (a) the observations and reports of McGovern, Lynch and Maltin; (b) the fact that Triad was bringing in new equipment to the Neville Island warehouse; and (c) Hammond's own observations of plaintiff's deficient performance. (Hammond Dec. ¶ 101; Hammond Dep. at 132:4-11, 138:6-9.)

On August 18, 2004, Hammond terminated plaintiff. (Id.) On that day, Hammond told plaintiff that due to the equipment upgrades that were to be installed at the warehouse, he was not confident in plaintiff's abilities to do his job because of his "problems." (Pl.'s Ex. E ¶ 3.) When plaintiff asked what problems Hammond was referring to, Hammond replied, "your heart problems." (Id.) Hammond also said that he believed plaintiff should be healthier now than before the surgery. (Pl.'s Dep. at 29.)

**Plaintiff's Replacement**

In August 2004, plaintiff was replaced as the Neville Island Manager by Michael Benlock ("Benlock"). (J.S. ¶ 145.) At the time of his termination from employment, plaintiff was forty-two years old and Benlock, his replacement, was twenty-eight years old. (Id.) Benlock formerly

managed the Triad Tube warehouse.  (Benlock Dec. ¶ 1.)  Both positions require similar skills and responsibilities.  (J.S. ¶ 141.) After his termination, plaintiff was hired as a warehouse manager for the Huston Group.  (J.S. ¶ 146.)  Plaintiff has remained employed in this position.  (Id.)

Plaintiff's vocational expert, Jay Jarrell ("Jarrell") found that plaintiff's duties as the Neville Island Manager were similar to warehouse manager duties in the industry.  (J.S. ¶ 141.)  In Jarrell's opinion, "if Mr. Borrelli is disabled from the job in question at [Triad], he would be regarded as disabled from the 2,020 comparable jobs for warehouse managers" in Pittsburgh, Pennsylvania area.  (J.S. ¶ 142.)

### Standard of Review

Under Federal Rule of Civil Procedure 56(c), all inferences based upon the available documents shall be drawn in favor of the nonmoving party.  FED. R. CIV. P. 56(c).  If the "pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law," summary judgment may be granted.  Id.  The mere existence of disputed facts is not sufficient to defeat a motion for summary judgment as a genuine issue of material fact must exist for the court to deny the summary judgment motion.  Moorer v. Verizon Commc'ns, Inc., No. 03-cv-01265, 2005 U.S. Dist. LEXIS 39783 (W.D. Pa. Oct. 27, 2005) aff'd, 2006 U.S. App. LEXIS 30037 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson,

477 U.S. at 249.  Any material or evidence that would be admissible or usable at trial may be considered by the court when judging the merits of the motion for summary judgment.  <u>Horta v. Sullivan</u>, 4 F.3d 2, 8 (1st Cir. 1993); <u>Pollack v. City of Newark</u>, 147 Supp. 35, 39 (D.N.J. 1956), <u>aff'd</u>, 249 F.2d 543 (3d Cir. 1957), <u>cert. denied</u>, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

*Discussion*

## I. <u>Disability Discrimination</u>

The ADA[1] prohibits an employer from discharging or discriminating against any individual employee on the basis of the employee's disability if the employee: (1) has a disability within the meaning of the act; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; and (3) has suffered an otherwise adverse employment decision as result of discrimination.  <u>Gaul v. Lucent Technologies, Inc.</u>, 134 F.3d 576, 580 (3d Cir. 1998) (citing <u>Shiring v. Runyon</u>, 90 F.3d 827, 831 (3d Cir.1996)).  Disability discrimination claims filed under the ADA are analyzed under the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

The <u>McDonnell Douglas</u> framework requires a plaintiff alleging a violation of the ADA to first establish a prima facie case of discrimination.  The prima facie case, the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection."  <u>Texas Dept. of Cmty. Affairs v. Burdine</u>,

---

[1] Pennsylvania courts interpret the PHRA in accord with the ADA.  <u>Stulz v. Reese Bros., Inc.</u>, 835 A.2d 754 (Pa. Super. Ct. 2003); <u>Imler v. Hollidaysburg American Legion Ambulance Serv.</u>, 731 A.2d 169 (Pa. Super. Ct. 1999), <u>appeal denied</u>, 743 A.2d 920 (1999).  The PHRA claims will be subject to the same determination made with respect to the ADA claims.

450 U.S. 248, 254 (1981). In so doing, "the prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" Id. (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978).

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Simpson v. Kay Jewelers, Division of Sterling Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998). The burden on the defendant at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision. . . . " Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (emphasis added)(citations omitted).

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "'the McDonnell Douglas framework - with its presumptions and burdens' - disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non*,'. . . ." Reeves v. Sanderson Plumbing Products., Inc., 530 U.S. 133, 143 (2000) (citations omitted). The plaintiff, thus, has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

**A. Prima Facie Case**

Under this framework, a plaintiff must first establish a prima facie case of disability discrimination. Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997). To

establish a prima facie case of disability discrimination, the plaintiff must show that: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Gaul, 134 F.3d at 580.

The parties disagree about whether the three elements necessary to establish a prima facie case of disability discrimination, outlined in Gaul, are met in this case. Plaintiff argues that he was disabled within the meaning of the ADA, he was otherwise qualified to perform the essential functions of the job, and by being terminated he suffered an adverse employment decision as a result of discrimination. Defendant, however, argues that plaintiff was not regarded as disabled, he was not otherwise qualified to perform the essential functions of the job, and that he did not suffer an adverse employment decision as a result of discrimination.

**1. Disabled**

To raise a cognizable claim for discrimination under the ADA a plaintiff must establish, as part of his prima facie case, that he is disabled within the meaning of the ADA. Id. The ADA defines a "disability" as: (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such [an] individual"; (2) "a record of such impairment"; or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C).

Here, plaintiff alleges that he is a disabled person under the ADA because Triad regarded him as disabled. To be regarded as disabled an individual must prove either that (1) despite having no impairment at all, the employer erroneously believes that the plaintiff has an impairment that

substantially limits major life activities; or (2) the plaintiff has a nonlimiting impairment that the employer mistakenly believes limits major life activities. Tice v. Centre Area Transp. Auth., 247 F.3d 507, 514 (3d Cir. 2001). In this case, plaintiff argues that Triad regarded Borrelli as disabled because it mistakenly believed his heart condition limited a major life activity–working. A number of equipment upgrades were scheduled to be installed in the summer of 2004. Hammond was not confident in Borrelli's ability to maintain this new equipment. Hammond attributed this lack of confidence in Borrelli's abilities to his "heart problems." (Pl.'s Ex. E ¶ 3.) Jarrell opined that if Borrelli was disabled from his position as Neville Island Manager, "he would be regarded as disabled from . . . 2,020 comparable jobs for warehouse managers." (J.s. ¶ 142) Under those circumstances, a reasonable jury could find that Triad believed – albeit perhaps mistakenly – that Borrelli's heart problems were limiting his ability to work as a warehouse manager.

Defendant cites a nonprecedential opinion, Robinson v. Lockheed Martin Corp., 212 Fed.Appx. 121 (3d Cir. Jan. 8, 2007), in support of its proposition that plaintiff is unable to establish that defendant regarded Borrelli as disabled within the meaning of the ADA. Defendant argues that Borrelli cannot show that Triad regarded plaintiff as disabled because he returned to his same position after his medical leave.

In Robinson, the plaintiff suffered from a medical condition and required a four-week medical leave of absence from his employment. Following his leave of absence, the plaintiff returned to work without medical restrictions. At the time of his return to work, the plaintiff's supervisor informed him that his work performance was lacking. Two months after the plaintiff returned to work, the plaintiff received a performance review, which indicated that plaintiff "need[ed] improvement." Id. at 122. The plaintiff continued to work in his position for

approximately two years at which time the employer terminated plaintiff's employment as well as three other employees. The plaintiff filed an ADA discrimination claim against the employer asserting that the employer regarded him as disabled and improperly terminated his employment.

The United States Court of Appeals for the Third Circuit found that the evidence was "insufficient to show that [the employer] regarded [the plaintiff] 'as precluded from more than a particular job.'" Id. a 125. The court of appeals noted that the employer permitted the employee to return to work in the same job without restrictions. Under these circumstances the district court's granting of summary judgment in favor of the defendant was upheld.

The instant case is distinguishable from Robinson. In Robinson, the plaintiff had worked for nearly two years after his medical leave and there were no statements allegedly made by a supervisor linking the plaintiff's termination to his medical condition. Here, plaintiff returned to work on February 23, 2004 and a few days later his physician restricted his physical activity, i.e., his physician only permitted plaintiff to work four to six hours per day. Plaintiff worked four to six hours per day for approximately three months at which time plaintiff became ill and requested vacation time. When plaintiff returned to work, Hammond informed plaintiff that he would no longer be paid for hours that he did not work. In mid- to late-May 2004, plaintiff returned to a full-time work schedule without any medical restrictions. Approximately three months later, on August 18, 2004, plaintiff was terminated from his employment and plaintiff testified that he was told by Hammond that the reason for the termination was plaintiff's "heart problems." (Pl.'s Ex. E ¶ 3.) Under these circumstances, unlike Robinson, there is a genuine issue of material fact in dispute with respect to whether he was regarded as disabled.

Viewing the disputed facts and drawing all reasonable inferences in favor of plaintiff, the

court concludes that plaintiff adduced sufficient evidence to satisfy the first element of a prima facie case of disability discrimination.

### 2. Qualified Individual

Having concluded that plaintiff adduced sufficient evidence of a disability, the court must consider whether he is a "qualified individual" under the ADA. The ADA defines a "qualified individual with a disability" as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

There is a two-part test utilized to determine whether an employee is a "qualified individual with a disability." Gaul, 134 F.3d at 580. The first part of the test requires the court to consider whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." Id. (citing 29 C.F.R. pt. 1630, App. at 353-54). Second, the court must determine "whether or not the individual can perform the essential functions of the position held or desired with or without reasonable accommodation." Id.

In this case, Borrelli satisfies the first prong of the test because he was originally qualified for the warehouse manager position and was not criticized about his job performance until 2003. Furthermore, Triad evaluated Borrelli throughout this time and awarded him bonuses and raises in 2003. A memorandum dated July 8, 2002, stated that Borrelli's "probability of continued employment was excellent." In August and December 2003, Triad recognized that Borrelli's work performance had greatly improved. Finally, Borrelli continues to work as a warehouse manager with similar responsibilities.

Borrelli also satisfies the second prong of the test because he was able to perform the essential functions of his position by at least May 2004. From late February 2004 until mid-May 2004 Borrelli required accommodation. During this time Borrelli could perform all the essential functions of his job, although he worked on a restricted schedule. Beginning in mid-May 2004, Borrelli began working a complete schedule. Viewing the disputed facts and drawing all reasonable inferences in favor of plaintiff, the court concludes that plaintiff adduced sufficient evidence to satisfy the second element of a prima facie case of disability discrimination.

**B. Adverse Employment Decision**

With respect to the third element of a prima facie case of disability discrimination, it is undisputed that plaintiff was terminated from his employment with Triad. It is well settled that termination from employment is an adverse employment action. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 288 (3d Cir. 2001) . Under these circumstances, plaintiff adduced sufficient evidence to satisfy the third element of a prima facie case of disability discrimination.

**C. Burden Shifting**

**1. Nondiscriminatory Legitimate Reasons**

In this case, Borrelli successfully adduced sufficient evidence to establish a prima facie case for disability discrimination. The burden, therefore, shifts to defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's termination. Krouse, 126 F.3d at 500. The burden on Triad at this junction is "relatively light," and can be satisfied "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for [Borrelli's termination]. . . ." Fuentes, 32 F.3d at 763 (emphasis added)(citations omitted). To

satisfy this burden Triad referenced Borrelli's work performance deficiencies including: failure to maintain Triad's equipment and facility, inability to maintain a safe working environment, and personal shortcomings with respect to sporadic working hours and one instance of falling asleep in a meeting. Triad asserts that it made the decision to terminate Borrelli in November 2003, before anyone was aware of his heart condition. Defendant's articulated reasons for termination meet the relatively light standard to show a legitimate nondiscriminatory reason for terminating Borrelli.

Because Triad offered legitimate, nondiscriminatory reasons to justify Borrelli's termination, "'the McDonnell Douglas framework - with its presumptions and burdens' - disappear[s], . . . and the sole remaining issue [is] 'discrimination *vel non*,' . . . ." Reeves, 530 U.S. at 143 (citations omitted). Borrelli has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by Triad were not its true reasons, but were pretext for discrimination. Jones, 198 F.3d at 410. The crux of this summary judgment motion is whether the proffered reasons relied upon by Triad were pretextual.

### 2. Establishing Pretext

Once an employer has stated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff in order to survive summary judgment must meet the two-prong test articulated by the United States Court of Appeals for the Third Circuit in Fuentes:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Fuentes, 32 F.3d at 764.

19

### a. Prong One

A plaintiff must submit evidence that could cause a reasonable factfinder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring his case to trial. To discredit the employer's articulated reason, the plaintiff does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, nor produce additional evidence beyond his prima facie case. Id. (citing Sempier v. Johnson & Higgins, 45 F.3d 724, 764 (3d Cir. 1995)). The plaintiff must, however, demonstrate:

> "weaknesses, implausibilities, inconsistencies, incoherencies [sic], or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence'" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action. [Fuentes, 32 F.3d] at 764-65 (quoting [Ezold, 983 F.2d at 531]).

Simpson, 142 F.3d 639 at 644. The question asked in prong one of the Fuentes test is not whether the employer made the best, or even a sound, business decision; it is whether the real reason for the adverse result suffered by the plaintiff is discrimination. Keller v. ORIX Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997).

An employment decision that would create a problem under prong one will likely turn on whether the stated reason for termination is so implausible that a factfinder could not believe it to be worthy of credence. For example, in Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995), the plaintiff was fired due to deficient sales performance. The evidence of record, however, disclosed that the plaintiff received a bonus three months prior to his termination and that he was the only sales employee in his region to have received such a bonus. The court held that, where the primary measure of the employee's performance was his sales, and where he was

the leading salesperson in the region, the employer's stated reason for his termination was "contradictory to [its] admission that the most important standard of job performance is sales." Id. at 332. According to the court, "[a] factfinder could find it implausible that Quaker State would have fired Brewer for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program - sales." Id.

Sempier is another case in which an employer stated the plaintiff was terminated because of poor performance causing the company to restructure the nature of his responsibilities. The evidence of record, however, disclosed that (1) the plaintiff never received any unfavorable criticism that his performance was poor or inadequate; and (2) the employer failed to produce any other evidence of poor performance or to make specific allegations of the plaintiff's deficiencies. Sempier, 45 F.3d at 731-33. Thus, there was evidence on the record that a reasonable factfinder could conclude that the reason given in Sempier by the employer was a pretext for age discrimination. Id. at 732-33.

When considering the facts of record in this case in the light most favorable to the nonmoving party, the court concludes that plaintiff adduced sufficient evidence to meet prong one of the Fuentes test. First, Borrelli stated Hammond told him that Hammond could not trust plaintiff because of his "heart problems." Hammond's denies making this statement, which raises an issue of credibility, to be resolved by a jury. Second, despite Triad's alleged decision to terminate Borrelli in November 2003, Borrelli continued to work for approximately nine months. This fact is inconsistent with the proffered reasons relied upon by Triad. If Borrelli was endangering employees and damaging company property, as Triad claims, a reasonable jury could find that it is unlikely Triad would have allowed plaintiff to continue working as the Neville Island Manager. Third, with respect to the December 2003 conversations between (1) Borrelli and

Hammond; and (2) Borrelli's wife and Hammond, Hammond indicated that Borrelli's performance was satisfactory and improving and Hammond told Borrelli and his wife that if Borrelli continued performing positively he may become a partner during the next year.  Fourth, Borrelli received a raise in 2003 in the same percentage as the one he received in 2002.  The raise was based on three percent of Borrelli's salary.  Additionally, Triad documented that Borrelli's 2003 bonus was expected to be equal to his 2002 bonus.  Finally, according to a request for verification of employment form that was completed by Triad on August 19, 2003, Borrelli's probability of continued employment was excellent.  Viewing the facts in the light most favorable to plaintiff, the court concludes that a reasonable jury could find that defendant's proffered reasons for terminating Borrelli are inconsistent or implausible and that defendant's actions were pretext for discrimination.[2]  Since only one prong of the <u>Fuentes</u> test needs to be satisfied, and plaintiff satisfied prong one, defendant's motion for summary judgment must be denied with respect to plaintiff's ADA claims.

### 3.  Prong Two

Because plaintiff presented sufficient evidence to demonstrate inconsistencies or implausibilities in defendant's proffered reasons for plaintiff's termination, the court need not address the second prong of the <u>Fuentes</u> test.

---

[2]When plaintiff questioned Hammond about the reason for plaintiff's termination, Hammond stated that plaintiff could not be trusted to maintain properly Triad's new equipment due to his "heart problems."  (Pl.'s Ex. E ¶ 3.)  This statement arguably might be direct evidence of discrimination.  Direct evidence of discrimination is assessed using a two-step burden-shifting test drawn from <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989).  Since plaintiff survived summary judgment under the <u>McDonnell Douglas</u> burden-shifting framework, the court need not consider the <u>Price Waterhouse</u> test.

## II. Age Discrimination

The ADEA[3] prohibits an employer from discharging or discriminating against an employee on the basis of age if the employee is over forty years old. 29 U.S.C. §§ 623(a), 631(a); 43 PA. CONS. STAT. §§ 954(h), 955(a).  Age discrimination claims filed under the ADEA are analyzed under the McDonnell Douglas burden-shifting framework set forth above for disparate treatment claims.  See Simpson, 142 F.3d at 645.

### A. Prima Facie Case

Under the McDonnell Douglas framework, as discussed previously, a plaintiff must first establish a prima facie case of age discrimination.  Hicks v. Tech Industries, 512 F.Supp.2d 338, 346 (W.D. Pa. 2007).  To establish a prima facie case of age discrimination, a plaintiff must show that [he]: (1) is a member of the protected class, i.e. at least 40 years of age, (2) is  qualified for the position, (3) suffered an adverse employment decision, and (4) that he was replaced by a sufficiently younger person in the case of demotion or termination.  Simpson, 142 F.3d at 644; see Steward v. Sears Roebuck & Co., 231 Fed.Appx. 201, 210 n.5 (3d Cir. 2007).

There is no dispute that plaintiff fulfilled three of the four elements required under Simpson to establish a prima facie case of age discrimination.  The parties agree that plaintiff was over forty at the time of his termination, was terminated from his position, and was replaced by a sufficiently younger person.  The only element in dispute is whether plaintiff was qualified for the position.

### 1. Plaintiff's Qualifications

A plaintiff's qualifications are reviewed according to an objective standard.  Sempier, 45

---

[3]The standards under the ADEA and the PHRA are the same and will therefore be decided and discussed together.  See Kautz v. Met-Pro Corp., 412 F.3d 463, 465 (3d Cir. 2005).

F.3d at 729; Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990) (evaluating plaintiff's objective qualifications for a prima facie case and disregarding allegations of poor performance). Allowing plaintiff to make a prima facie case without evaluating his subjective qualities permits the court to reserve judgment of evaluations, that may mask pretext, until the latter stages of the McDonnell Douglas analysis. Weldon, 896 F.2d at 798; Fowle v. C&C Cola, 868 F.2d 59, 64-65 (3d Cir. 1989) ( consideration of subjective qualifications was correctly reserved for the examination of pretext and should not occur during the establishment of the prima facie case). A plaintiff's satisfactory performance over many years can create an inference that he was qualified for the position. Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989) (stating that plaintiff's employment as a "lead man" for eight years was sufficient to show that he was qualified for the position). Defendant's statements regarding plaintiff's alleged deficiencies are subjective observations and, therefore, are reserved for examination after plaintiff has the opportunity to establish a prima facie case based on objective evidence.

Considering the evidence in the light most favorable to plaintiff, plaintiff presented sufficient objective evidence to meet this element. Plaintiff adduced evidence that he was employed with Triad as the Neville Island Manager from August 2001 until his termination in August 2004. Plaintiff's performance in 2002 and 2003 was satisfactory. On July 8, 2002, Hammond sent plaintiff a memorandum regarding his pay raise. The memorandum thanked plaintiff for his hard work despite a poor economy. On August 13, 2003, Triad filled out a verification of employment form to help plaintiff obtain a loan. Triad documented plaintiff's former raises and bonuses on the form and noted that plaintiff's "probability of continued employment was excellent." (Pl.'s Ex. C.) Plaintiff received a raise in 2003 of an equal percentage and greater dollar amount than his raise in 2002.

Plaintiff's employment as the Neville Island Manager for three years, along with the documentation with respect to his performance and merit increases, suggests that he was qualified for the position. After his termination, plaintiff was hired by another company, Huston Group, for a warehouse manager position which required skills and responsibilities similar to there of the Neville Island Manager. Plaintiff remains employed as a warehouse manager for Huston Group. Under those circumstances, the court concludes that plaintiff adduced sufficient evidence to show he was qualified for the position.

**B. Burden Shifting**

Once a plaintiff successfully establishes a prima facie case of age discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. Hicks, 512 F.Supp.2d at 346. As previously discussed, defendant asserts that plaintiff's performance did not meet Triad's legitimate expectations and that his termination was based wholly on a number of performance deficiencies. Defendant alleges that plaintiff failed: to supervise his reports, to contribute to business operations, to manage properly the inventory, to maintain the integrity of the steel product, to maintain a safe work environment, to maintain the Neville Island warehouse structure, to maintain properly equipment, to manage the flow of operations, to manage the movement of shipments, and to maintain communication with the sales department. The court concludes that defendant meet the relatively light burden to proffer legitimate, nondiscriminatory reasons for terminating plaintiff.

**C. Establishing Pretext**

Where, as here, defendant met this minimal burden, plaintiff must adduce sufficient evidence that defendant's articulated reasons for terminating plaintiff were a pretext for discrimination. Hicks, 512 F.Supp.2d at 346. In order to survive summary judgment a plaintiff is not required to

"cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast doubt on a fair number of them, the plaintiff may not need to discredit the remainder." Fuentes, 32 F.3d at 764. Evidence sufficient enough to discredit some of the defendant's proffered reasons for terminating the plaintiff may be sufficient to cast doubt on all the proffered reasons even without specific evidence to contradict each specific allegation. Id.

In order to survive summary judgment and prove that the employer's reasons are pretextual, a plaintiff must meet one of the two prongs articulated by the United States Court of Appeals for the Third Circuit in Fuentes. Sempier, 45 F.3d at 764. Specifically, a plaintiff must (1) present evidence which casts sufficient doubt upon the legitimate reasons for termination offered by the defendant; or (2) provide specific types of evidence regarding the employer's treatment of employees that would lead a reasonable factfinder to infer that discrimination was a motivating factor behind the adverse employment decision. See Fuentes, 32 F.3d at 762.

**1. Prong One**

Under the first prong, a plaintiff's evidence must be sufficient to cause a reasonable factfinder to discredit the employer's articulated reason for the adverse employment action. The plaintiff is not required to produce additional evidence beyond the prima facie case. Fuentes, 32 F.3d at 764 (citing Sempier, 45 F.3d at 764). An employee's perceptions of his performance as well as documentation of positive performance is relevant to whether a jury could conclude that a defendant's failure to fault "[plaintiff's] performance leading to his discharge makes suspect its *post hoc* assertions of poor performance." See Sempier, 748 F.3d at 731.

Plaintiff adduced evidence to discredit defendant's proffered reasons for his termination by providing evidence that: plaintiff's work performance was satisfactory, that his raise in 2003 was

the same percentage as his raise in 2002, and that his bonus in 2003 was expected to be equal to that in 2002. Plaintiff and his wife each testified that they received positive feedback from Hammond with respect to plaintiff's work performance in late 2003. Specifically, in May 2003, McGovern told plaintiff's wife Diana that the warehouse "looked great" and that plaintiff was doing a great job. In December 2003, Hammond told plaintiff that he had improved since early 2003 (when plaintiff had experienced prescription drug problems) and that if he stayed on track, they would discuss partnership opportunities during the following year. Later in December 2003, at a holiday party, Hammond told plaintiff's wife that plaintiff was doing well.

Plaintiff's admitted performance problems in 2003 are implicated in defendant's second allegation that plaintiff failed to contribute to business operations. Defendant's support for this contention was based on an incident in 2003 when plaintiff fell asleep in an office meeting. Plaintiff admitted to falling asleep during an office meeting in spring 2003, but attributed it to adverse symptoms from prescription drug use. As a result, plaintiff and his wife discussed plaintiff's problem with Hammond and plaintiff ceased using the medications. A month or two after plaintiff quit using the medications, Hammond told plaintiff that he had intended on firing him, but decided against it after conferring with one of the salesmen, Scott Lynch, who stated, "what would you want to fire him now for, he is doing a great job." (Pl.'s Ex. A. ¶148.) In light of those circumstances, a reasonable factfinder could conclude that plaintiff overcame the performance problems he had in spring 2003 and was once again satisfactorily performing his work.

Defendant asserts that sometime in November 2003, the decision was made to terminate plaintiff due to performance deficiencies, yet plaintiff was not terminated nor reprimanded for those alleged deficiencies until about nine months later. Defendant's assertion that a decision was

made in the fall of 2003 to terminate plaintiff is cast into doubt by the positive performance feedback both plaintiff and his wife received with respect to plaintiff's work in December 2003 and the nine-month interval between when the alleged decision was made and plaintiff's actual notice of termination.

Hammond claims that plaintiff was not told of his termination during December 2003 because it is against company policy to terminate an employee before the holidays. Hammond, however, does not explain why plaintiff was not immediately told of the termination when he returned to work after the holiday break. On January 8, 2004, four days after plaintiff returned to work from his holiday break, plaintiff was admitted to the hospital because he was not feeling well. Hammond asserts that once plaintiff was admitted to the hospital and diagnosed with heart problems, Hammond decided to give plaintiff another chance to improve his work performance.

Plaintiff was terminated on August 14, 2004, approximately nine months after the alleged decision to terminate him was made. When examining the record, evidence that shows inconsistences or anomalies can support an inference that the employer did not take action for its stated reasons. Sempier, 45 F.3d at 731. The lapse in time from the alleged decision along with the evidence of favorable feedback regarding plaintiff's employment is enough for a reasonable factfinder to question the legitimacy of defendant's proffered reasons for terminating plaintiff.

Plaintiff adduced sufficient evidence to show that a genuine issue of material fact exists with respect to whether plaintiff was discharged due to poor performance or due to age discrimination. Under the first prong of the Fuentes framework, plaintiff satisfied his burden of discrediting the proffered reasons for his termination. The determination whether plaintiff was affected by age discrimination, therefore, cannot be made at summary judgment and must be left to the jury to resolve.

## 2. Prong Two

The second prong of the <u>Fuentes</u> framework serves as an alternate means for plaintiff to satisfy his burden of proving sufficient evidence of pretext through presenting evidence that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Fuentes</u>, 32 F.2d at 764. Since plaintiff satisfied his burden of establishing the possibility of pretext by discrediting defendant's assertions under the first prong, the court need not evaluate the second prong of the <u>Fuentes</u> test.

### *Conclusion*

After considering the undisputed material facts of record, viewing all disputed facts in the light favorable to the nonmoving party, and drawing all reasonable inferences in favor of the nonmoving party, the motion for summary judgment filed by defendant will be denied with respect to plaintiff's ADA, ADEA and PHRA claims. The court concludes that plaintiff adduced sufficient evidence with respect to his claims for disability discrimination and age discrimination for a reasonable factfinder to render a verdict in his favor under the ADA, the ADEA and the PHRA. There are issues of credibility in this case which will need to be resolved by a jury.

### ORDER

**AND NOW**, this 24th day of July, 2008, upon consideration of the parties' arguments and supporting documents, **IT IS ORDERED** that defendant's motion for summary judgment (Docket No. 37) is **DENIED**.

By the court:
<u>/s/ JOY FLOWERS CONTI</u>
Joy Flowers Conti
United States District Judge

cc: Counsel of record