## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CRAIG R. BORRELLI,

       Plaintiff,

    v.

METAL TRADERS, INC. d/b/a TRIAD
METALS INTERNATIONAL,

       Defendant.

Civil Action No. 2:06-cv-00869-JFC

Judge:  Joy Flowers Conti

Electronically Filed

## BRIEF IN SUPPORT OF MOTION TO EXCLUDE EXPERT REPORTS AND RELATED TESTIMONY OF JAY K. JARRELL

Dated:   January 30, 2009

Roy A. Powell, Esq. (Pa. Bar No. 37487)
Amy E. Dias, Esq. (Pa. Bar No. 52935)
James S. Urban, Esq. (Pa. Bar No. 82019)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA  15219-2502
Telephone:  (412) 391-3939
Facsimile:  (412) 394-7959
Email:   rapowell@jonesday.com
       aedias@jonesday.com
       jsurban@jonesday.com

Counsel for Defendant, Metal Traders, Inc.,
d/b/a Triad Metals International

Pursuant to Federal Rule of Evidence 702, this Court should exclude any remaining testimony of Jay K. Jarrell ("Jarrell"), who is the designated expert of Plaintiff Craig R. Borrelli ("Borrelli"), because Borrelli cannot demonstrate (i) that Jarrell's testimony is based upon sufficient facts or data, (ii) that the testimony is the product of reliable principles and methods, or (iii) that Jarrell has applied his principles and methods reliably to the facts of this case.

## I.      BACKGROUND

Borrelli was the former Warehouse Manager of the Neville Island Warehouse operated by Defendant Metal Traders, Inc., d/b/a Triad Metals International ("Triad").  He alleges that he was terminated by Triad due to his age and a "perceived disability."  Borrelli claims to be entitled to receive damages in the form of back pay and future earnings.  He intends to call Jarrell as an expert witness at trial as to both liability and damages.

## A.      The First Daubert Hearing

In his original report dated August 29, 2007, Jarrell opined, with respect to the issue of liability, that "if Mr. Borrelli is disabled from the job in question at [Triad], he would be regarded as disabled from *2,020 Warehouse Manager jobs* in this area."  See Motion Tab A, Jarrell Expert Report dated August 29, 2007 (confidential portions redacted).  Regarding damages, Jarrell opined that Borrelli was entitled to future earnings for the balance of his working life.  Id.  Jarrell also included, as an element of damages, the value of an ownership stake in Triad that he incorrectly assumed Borrelli would have received had Borrelli remained the Warehouse Manager of the Neville Island Warehouse.  Id.  On September 2, 2008, Triad filed its original Daubert motion challenging the admissibility of Jarrell's opinions.  See Docket Nos. 75-76.

At an initial Daubert hearing held on October 9, 2008, the Court rejected Jarrell's inclusion of the value of a Triad ownership stake in his damages calculation because it "is

complete speculation."  See Motion Tab B, Oct. 9, 2008 Hearing Transcript at 43:23-44:2 and

44:20-45:7.  The Court preliminarily ruled "at this stage" that Jarrell could testify regarding the

purported 2,020 other "*Warehouse Manager jobs* in this area" because it appeared (at least

preliminarily) that Jarrell "made the determination that there were other jobs in the local

community that had similar responsibilities.  And that's what he would be testifying to."  Id. at

46:13-47:12.  Finally, the Court reserved judgment on whether Jarrell's methodology of

calculating Borrelli's future lost wages was reliable and directed the parties to submit further

briefing on the issue.  Id. at 53:8-12; see also Docket Nos. 81, 83 (supplemental briefs).

**B.**       **The Second Daubert Hearing**

At a second Daubert hearing on November 6, 2008, the Court rejected Jarrell's opinion

that Plaintiff's future lost earnings could span 16.4 years because the opinion was "speculative"

and "insufficient."  See Motion Tab C, Nov. 6, 2008 Hearing Transcript at 3:11-22 and 36:1-2.

The Court further found that, because Jarrell's opinion was nothing more than simple addition

and subtraction, "it's just pure mathematics [and] it's not helpful to have an expert."  Id. at 15:1-

2.  The Court stated that the appropriate issue, if any, for Jarrell to attempt to address was how

long it would take Borrelli to find a job (assuming that Borrelli attempted to do so) with

substantively equivalent pay.  Id. at 7:9-25.  On that point, the Court specifically questioned

Jarrell:

| **The Court**: | What would be the reasonable range? |
|---|---|
| **Jarrell:** | I think the range would be … three [years] on the low end, and at lease [sic] half of the 16 [years] on the high end. |
| **The Court:** | So, eight something? |
| **Jarrrell:** | Yes. |
| **The Court:** | So, it's not 16.4 [years]. |

Id. at 16:10-16.  Minutes later, Jarrell further reinforced that opinion, stating that "I've said three [years], I've said eight [years].  *I'm comfortable with that.  Do I think it would take [Borrelli] 16 years and he never would be successful?  The odds are that that would not be true; that he would be -- find a way to improve his situation significantly in that time frame*."  Id. at 18:25-19:4.

The Court then directed Borrelli to submit a revised report from Jarrell, setting forth the opinion that he expressed to the Court during the hearing and describing the bases for the opinion. Id. at 34:4-7 ("Based on what we heard today, I think you know what the issue is and what the opinion is.  *We heard that.*  I think *that* needs to be set forth, and the basis and, you know, the support that an expert in an opinion would give.  Okay?").

**C.      Borrelli's Revised Expert Report**

On November 13, 2008, Borrelli filed and served Jarrell's Revised Expert Report, but in violation of the Court's directive, the report made no mention of Jarrell's admissions and the Court's directives during the November 6, 2008 Daubert hearing.  Rather, Jarrell abandoned his sworn testimony and, again, extrapolated Borrelli's future lost earnings over 16-plus years, opining that Borrelli would suffer future lost wages of $237,236.00 through 2025.  See Tab D, Revised Expert Report dated November 12, 2008.  Jarrell's stated bases for that opinion included the following: First, citing to Bureau of Labor Statistics ("BLS") data, Jarrell stated that the current median annual salary for the job "*Warehouse Manager*" in the Pittsburgh Metropolitan Statistical Area ("MSA") was $50,860.00.  Id. at p. 2; Tab E, Jarrell Depo. at 28:6-11.  Second, Jarrell assumed (albeit without any factual support) that Borrelli would in 2009 pursue and obtain a job paying at the 25 percentile level for the job "*Warehouse Manager*" in the Pittsburgh MSA, then three years later in 2012 pursue and obtain a "*Warehouse Manager*" job that paid the median annual salary.  See Tab D, Revised Expert Report.  Third, Jarrell assumed that (except for salary increases related to the two job changes that Jarrell *assumed* Borrelli would make)

- 3 -

Borrelli's salary would increase 3% per year.  He also assumed that Borrelli's base wages at

Triad would have increased 3% per year.  His ultimate methodology was that he simply

calculated the difference between Borrelli's Triad wages (grown at the rate of 3% per year) and

Borrelli's expected wages.  Of course, Borrelli's expected wages were based on the assumptions

that Borrelli will in 2009 obtain a job paying at the 25 percentile level for the job "*Warehouse*

*Manager*" in the Pittsburgh MSA, then three years later in 2012 obtain a "*Warehouse Manager*"

job that paid the median annual salary, each grown at the rate of 3% annually.  Id.

**D.      Jarrell's Background, Data and Flawed Methodology**

As directed by the Court, Triad deposed Jarrell on January 12, 2009, at which time Jarrell

described his professional background, the sources of data contained in his original Expert

Report and Revised Expert Report, and the methodology underlying his opinions.  With respect

to his background, Jarrell described experience with outplacement, in which he helps individuals

who have lost their job conduct a job search and obtain new employment.  See Tab E, Jarrell

Depo. at 6:25-8:4.  Jarrell was adamant that it is up to the individual looking for a new job to

identify potential employers by contacting people with whom the individual has networked, by

scanning classified advertisements, or by attending job fairs.  Id. at 12:11-13:25.

Next, preliminarily speaking about the data on which he relied, Jarrell stated that he

relied upon BLS data in his Revised Expert Report because "it's the most comprehensive, and

it's federal."  Id. at 45:13-14.  He also said he has relied upon BLS data in the past, and believed

it was appropriate to rely upon BLS data for the Pittsburgh Metropolitan Statistical Area in this

particular case.  Id. at 46:1-13.  As for his original Expert Report (which included Jarrell's

opinion that there existed 2,020 "*Warehouse Manager*" jobs in the Pittsburgh Metropolitan

Statistical Area), Jarrell relied on Pennsylvania Department of Labor data.  Id. at 47:10-58:6.  As

Jarrell explained, the state provides "data available as to how many jobs of any given category,

in any given occupational category exists in the marketplace and then based on patterns of growth how many of those are apt to be available for various future periods of time.  It's usually about a ten-year projection on out."  Id.

Finally, turning to the specifics of his methodology, Jarrell made the following admissions:  **First,** Jarrell admitted that the BLS publishes wage data relating to occupational classifications that are set forth in a publication known as the Dictionary of Standard Occupational Classification Codes ("SOC Dictionary").  See Tab E, Jarrell Depo. at 28:6-11 and 44:6-11; Tab F, SOC Dictionary.  Jarrell further admitted that the SOC Dictionary does *not* contain an occupational classification known as "*Warehouse Manager*."  As a result, directly contrary to what Jarrell wrote in his original Expert Report and Revised Expert Report, the BLS does *not* publish a median annual salary (or any wage or jobs projection data) for "*Warehouse Manager*."  See Tab E, Jarrell Depo. at 23:23-24:8 and 28:1-5.  Thus, his statements that there existed "*2,020 Warehouse Manager jobs*" (original Expert Report) and that the BLS published a median annual salary for "*Warehouse Manager*" (Revised Expert Report) were both false.

**Second,** because the BLS does not publish wage data for "*Warehouse Manager*," Jarrell admitted that he used wage data relating to SOC Dictionary occupational classification code 53-1031, which specifically relates to "First-Line Supervisors/Managers of Transportation and Material-Moving Machine and Vehicle Operators."  See Tab E, Jarrell Depo. at 29:25-30:2.  The SOC Dictionary states that individuals who fit within this occupational classification are those who "*directly* supervise and coordinate activities of transportation and material-moving machine and vehicle operators and helpers."  See Tab F, SOC Dictionary.  Further, as Jarrell admits, the SOC Dictionary expressly identifies "Dockmaster, Gas Station Manager, [and] Roadmaster" as jobs being within this occupational classification.  See id.; Tab E, Jarrell Depo. at 29:5-17.

- 5 -

**Third,** Jarrell admitted that, from reading Borrelli's deposition testimony and from interviewing Borrelli, he was aware that Borrelli was not a first-line supervisor, nor was he a dockmaster, a gas station manager, or a roadmaster.  Rather, Jarrell admitted that Borrelli was employed by Triad as a *Warehouse Manager*, a second-level management job in which Borrelli supervised shift foremen, who were the first-line supervisors who directly supervised the crane operators and saw operators on the respective shifts.  Jarrell further admitted that Borrelli's duties actually included coordinating warehouse activities across the three shifts and general warehouse planning.  See Tab E, Jarrell Depo. at 31:6-32:10 and 32:23-33:1.

**Fourth,** even though Jarrell was aware that the SOC Dictionary lists illustrative examples of jobs that fall within each occupational classification (see Tab E, Jarrell Depo. at 29:5-11), he testified that he did not find any occupational classification that listed "*Warehouse Manager*" as an illustrative example.  See id. at 33:7.  As a result, Jarrell failed to conduct adequate research and had absolutely no idea when he formulated his opinions that SOC Dictionary code 11-3071, titled "Transportation, Storage, and Distribution Managers," expressly listed "*Warehouse Manager*" as an illustrative example of a job that falls within that occupational classification:

> Q.      There's a [classification] titled Transportation, Storage and Distribution Managers, 11-3071.  … Do you see the illustrative examples that are listed there?
>
> **Jarrell:**  Yes.  *Warehouse Manager* is one of them.
>
> Q.      Did you look at this [classification] when you were pulling wage data?
>
> **Jarrell:**  No.
>
> Q.      Why not?
>
> **Jarrell:**  *I wasn't aware of it.*[1]

---

[1] The SOC Dictionary (Tab F) is publicly available on the internet in word-searchable Adobe Acrobat (.pdf) format.  See www.paworkstats.state.pa.us/misc/socdictionary.pdf.  As such, any user (Jarrell included) can easily search for words or phrases.  Had Jarrell simply

See id. at 33:13-25.  The SOC Dictionary states that individuals who fit within this occupational classification "[p]lan, direct, or coordinate transportation, storage or distribution activities," just as Jarrell admits that Borrelli did when he was employed by Triad as Warehouse Manager of the Neville Island Warehouse.  See id. at 31:6-32:10 and 32:23-33; Tab F, SOC Dictionary.  Also, had Jarrell reviewed U.S. Census Bureau reports, he would have discovered that the Census Bureau links the job "Manager, warehouse" to SOC Dictionary code 11-3071.  See Tab P, U.S. Census Bureau data.

**Fifth,** Jarrell admitted that the median annual salary for occupational classification 11-3071 (relating to Transportation, Storage, and Distribution Managers *and specifically identifying "Warehouse Manager" as an example*) is $82,990.00.  See Tab E, Jarrell Depo. at 34:1-15; Tab G, BLS median annual salary for Transportation, Storage, and Distribution Managers, Pittsburgh MSA.  Jarrell further admitted that if Borrelli were to obtain a job within this more analogous occupational classification at the median annual salary, he would immediately be making more than he made at Triad, even including the incentive compensation that Borrelli earned from Triad.  Further, if Borrelli obtained such a job paying only in the 25th percentile, or $63,720.00, he still would be making more than what his base wage was at Triad. See id. at 39:14-21 and 39:24-40:21; Tab H, BLS 25th percentile annual salary for Transportation, Storage, and Distribution Managers, Pittsburgh MSA.

**Lastly,** Jarrell could not explain how he determined that $50,860.00, the number on which he bases his future economic loss calculation, was the median annual salary for *Warehouse Manager* in the Pittsburgh MSA.  See Tab D, Revised Borrelli Report at pp. 2-3.

_____

(continued…)

searched the document for the terms "warehouse," "manager," or "warehouse manager," presumably he would have discovered code 11-3071.

Jarrell attributed the $50,860.00 figure to the BLS and testified that he pulled it "from the internet." See Tab E, Jarrell Depo. at 20:8-19. Jarrell further admitted that all wage data published by the BLS (both currently and when he drafted his Revised Expert Report) is dated May 2007, the most recent period for which data is available. Id. at 44:25-45:10.

With respect to the Pittsburgh MSA, and using the data from May 2007, there are *no* occupational classifications for which the median annual rate is $50,860.00. See Tab I, BLS annual median wage, all occupational classifications, Pittsburgh MSA. In other words, Jarrell cannot point to any source data for his economic loss calculation. The dollar amount $50,860 is associated as a median annual rate only with an occupational category (as opposed to classification), Business and Financial Operations Occupations, which has no relation to Borrelli.[2] Id. Even though $50,860.00 is not the median rate for occupational classification 53-1031 (First-Line Supervisors/Managers of Transportation and Material-Moving Machine and Vehicle Operators) or any other classification, Jarrell used that number as the basis for his calculation of Borrelli's cumulative loss that is set forth on page 3 of the Revised Expert Report. See Tab E, Jarrell Depo. at 52:14-55:22.

_____

[2] The occupational category Business and Financial Operations Occupations includes the following occupational classifications, none of which apply to Borrelli: Agents and Business Managers of Artists, Performers, and Athletes; Purchasing Agents and Buyers, Farm Products; Wholesale and Retail Buyers, Except Farm Products; Purchasing Agents, Except Wholesale, Retail, and Farm Products; Claims Adjusters, Examiners, and Investigators; Insurance Appraisers, Auto Damage; Compliance Officers, Except Agriculture, Construction, Health and Safety, and Transportation; Cost Estimators; Emergency Management Specialists; Employment, Recruitment, and Placement Specialists; Compensation, Benefits, and Job Analysis Specialists; Training and Development Specialists; Human Resources, Training, and Labor Relations Specialists, All Other; Logisticians; Management Analysts; Meeting and Convention Planners; Business Operations Specialists, All Other; Accountants and Auditors; Appraisers and Assessors of Real Estate; Budget Analysts; Credit Analysts; Financial Analysts; Personal Financial Advisors; Insurance Underwriters; Financial Examiners; Loan Counselors; Loan Officers; Tax Examiners, Collectors, and Revenue Agents; Tax Preparers; and Financial Specialists, All Other. See Tab F, SOC Dictionary.

## II.   <u>ARGUMENT</u>

**A.   Legal Standard Under Rule of Evidence 702**

The Court should exclude all of Jarrell's unreliable opinions, barring any testimony

concerning future economic loss as well as testimony that Borrelli was perceived as being

disabled from 2,020 other *Warehouse Manager* jobs in the Pittsburgh area.  Pursuant to Federal

Rule of Evidence 702, a duly qualified expert may offer opinion testimony only "if (1) the

testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

principles and methods, and (3) the witness has applied the principles and methods reliably to the

facts of the case."  <u>See</u> Fed. R. Evid. 702; <u>see also</u> <u>Daubert v. Merrell Dow Pharms., Inc</u>., 509

U.S. 579, 592-93 (1993) ( "reasoning or methodology [must be] valid and … [properly] applied

to the facts in issue.")[3]  The <u>proponent</u> of the testimony bears the burden of establishing its

reliability.  <u>Id</u>. at 593 n.10.  The test of admissibility centers on "valid reasoning and reliable

methodology," <u>Kannankeril v. Terminix Int'l, Inc.</u>, 128 F.3d 802, 806 (3d Cir. 1997), but

"conclusions and methodology are not entirely distinct from one another …. A court may

conclude that there is simply too great a gap between the data and the opinion proffered."

<u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).

In short, the court "must examine the expert's conclusions in order to determine whether

they could <u>reliably</u> flow from the facts … ."  <u>Heller v. Shaw Indus., Inc</u>., 167 F.3d 146, 153 (3d

Cir. 1999) (emphasis added).  If not, the testimony cannot assist the jury and should be excluded.

<u>See</u> Fed. R. Evid. 702; <u>see also</u> 29 WRIGHT & GOLD, <u>FED. PRAC. & PROC</u>. § 6264, at 211 (1997)

(expert testimony does not "assist" the jury if it is "unrelated to facts at issue," "based on factual

---

[3] <u>Daubert</u> has since been extended to technical or other specialized knowledge, such as
Jarrell's testimony here.  <u>See</u> <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141 (1999).

assumptions that are not supported by the evidence," or where analysis underlying testimony is "illogical").

**B.       The Court Should Exclude Jarrell's Future Economic Loss Testimony**

   **1.       Jarrell's Future Economic Loss Testimony is
                Not Based on Sufficient Facts or Data**

The Court should exclude Jarrell's opinion and testimony regarding future economic loss because the data upon which Jarrell relied is grossly deficient; thus his opinions are not "based on sufficient facts or data."  Fed R. Evid. 702(1).  When determining whether this first element of Rule 702 is satisfied, a court must "assess whether the expert … had good grounds to rely on such data in drawing conclusions."  <u>Total Containment, Inc. v. Dayco Products, Inc.</u>, No. Civ. A. 1997-CV-6013, 2001 WL 1167506, *4 (E.D.Pa. 2001).  Here, that clearly is not the case.

Directly contrary to the misrepresentations contained in Jarrell's Revised Expert Report, Jarrell admits that he did not use wage data that specifically relate to the job "*Warehouse Manager*" in the Pittsburgh MSA.  Rather, Jarrell admits that there is no such data, so he selected wage data relating to the SOC Dictionary classification 53-1031, which specifically relates to "First-Line Supervisors/Managers of Transportation and Material-Moving Machine and Vehicle Operators."  <u>See</u> Tab E, Jarrell Depo. at 20:20-21:12, 29:25-30:2 and 51:4-7.  That occupational classification relates to individuals who "*directly* supervise and coordinate activities of transportation and material-moving machine and vehicle operators and helpers," such as "Dockmaster, Gas Station Manager, [and] Roadmaster."  <u>See</u> Tab E, Jarrell Depo. at 29:5-17; Tab F, SOC Dictionary.  As Jarrell admits, based on his interview of Borrelli and Borrelli's

deposition testimony, Borrelli was not employed as a first-line supervisor,[4] nor was he a dockmaster, gas station manager or roadmaster for Triad.  Id. at 31:6-32:10 and 32:23-33:1.

Second, Jarrell was unaware of and, thus, ignored the occupational classification that most appropriately applies to Borrelli's circumstance.  Specifically, occupational classification 11-3071, titled "Transportation, Storage, and Distribution Managers," expressly listed "*Warehouse Manager*" as an illustrative example of a job that falls within that occupational classification.  See Tab F, SOC Dictionary; see also Tab P, U.S. Census Data (linking the job "Manager, warehouse" to occupational classification 10-3071).  Further, the SOC Dictionary states that individuals who fit within this occupational classification "[p]lan, direct, or coordinate transportation, storage or distribution activities" – duties that Jarrell concedes Borrelli performed as *Warehouse Manager* for Triad.  See Tab E, Jarrell Depo. at 31:6-32:10 and 32:23-33; Tab F, SOC Dictionary.  The median annual wage in the Pittsburgh MSA for this job title is $82,990.00, approximately $32,000.00 more than the $50,860.00 figure that Jarrell relied upon.  See Tab E, Jarrell Depo. at 34:1-15; Tab G, BLS median annual salary for Transportation, Storage, and Distribution Managers, Pittsburgh MSA.  Jarrell did not consider job classification 11-3071, or the wage data related to it, because — in his words — *"I was not aware of it."*  Id. at 33:13-25.

Third, in all events, even if Jarrell selected the most appropriate occupational classification (which he clearly did not do) when he chose to use wage data most applicable to dockmasters, gas station managers and roadmasters (occupational classification 53-1031), he ultimately extracted "from the internet" and relied upon incorrect wage data in his Revised

---

[4] The fact that Borrelli was not a first-line supervisor is confirmed by the testimony of the actual first-line supervisors at the Neville Island Warehouse (Jeff Wyke, Frank Rimer and Gary Ritson), each of whom Borrelli deposed.  These first-line supervisors testified that they reported to Borrelli, and that they supervised the crane operators and saw operators in the warehouse.  See Tab M, Rimer Depo. at 21:24-22:22; Tab N, Ritson Depo. at 11:15-23 and 29:9-13; Tab O, Wyke Depo. at 10:14-20 and 13:4-12.

Expert Report.  See Tab E, Jarrell Depo. at 20:8-19.  According to BLS figures published for the Pittsburgh MSA, there is no occupational classification with a median annual wage of $50,860.00.  Jarrell readily admits that his entire cumulative loss calculation is based on his erroneous assumption that $50,860.00 is the median annual wage for occupational classification 53-1031.  See Tab E, Jarrell Depo. at 52:14-55:22.  In fact, $50,860.00 is *not* the median annual salary for occupational classification 53-1031 or for any other.  Nonetheless, Jarrell assumed that $50,860.00 was the median annual salary, added 3% annually to that number, then subtracted it from what he assumed Borrelli would have made at Triad.  See Tab D, Revised Expert Report.  Thus, Jarrell's future loss calculation is inaccurate.

In light of the foregoing, Borrelli cannot carry his burden of showing that Jarrell's economic loss testimony is based upon sufficient facts or data.  Jarrell's underlying wage data has no relation to Borrelli's job with Triad, and Jarrell did not have "good grounds to rely on such data in drawing conclusions."  Total Containment, 2001 WL 1167506 at *4.  As a result, the Court should bar Jarrell's future economic loss testimony.

### 2. Jarrell's Economic Loss Opinion is Not the Product of Reliable Principles and Methods

The Court also should exclude Jarrell's economic loss opinion because it is not the product of reliable principles and methods.  When determining the reliability of an expert's methodology, courts should assess "whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results."  Bauer v. Bayer A.G., 564 F. Supp. 2d 365, 375 (E.D. Pa. 2008) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994)).  Daubert clearly requires more than a "haphazard, intuitive inquiry."  Oddi, 234 F.3d at 146.

- 12 -

First, even though his original Revised Expert Report states otherwise, Jarrell freely admitted that there is no wage data published for an occupational classification known as "*Warehouse Manager*."  See Tab E, Jarrell Depo. at 23:23-24:8 and 28:1-5.  Thus, left to determine which occupational classification most appropriately applied to Borrelli's circumstances, Jarrell's analysis was grossly deficient.  Indeed, when asked why he did not consider the "Transportation, Storage, and Distribution Managers" occupational classification (which expressly listed "*Warehouse Manager*" as an illustrative example), Jarrell admitted that he never considered it because he "wasn't aware of it."  Id. at 33:13-25.  Jarrell's ignorance of an occupational classification that included "*Warehouse Manager*" as an example demonstrates that his methodology was grossly deficient and unreliable.

Second, Jarrell's methodology is demonstrably unreliable because he assumed (without factual support) that Borrelli has attempted to mitigate his damages to date and/or will make a substantive effort in 2009 and again in 2012 to find a job that pays better wages.  A plaintiff fails to mitigate his damages when "substantially equivalent work was available, and … the claimant did not exercise reasonable diligence to obtain such employment."  See Stremple v. Nicholson, No. 06-3807, 2008 WL 3919376, *4 (3d Cir. August 27, 2008) (recognizing that mitigation requirements vary with level of seniority and skill set, but plaintiff must try to obtain comparable employment).

Here, Jarrell concedes that the Pennsylvania Department of Labor and Industry Center for Workforce Analysis publishes data related to the number of jobs available in particular occupational classifications, which Jarrell himself relied upon in drafting his original report. See Tab E, Jarrell Depo. at 47:10-48:6.  Those same statistics indicate that there exist, on average dating back to 2004 (when Borrelli was terminated), 14 job openings per year in the Pittsburgh

- 13 -

MSA within the "Transportation, Storage, and Distribution Managers" classification (which includes "*Warehouse Manager*" and for which the median annual wage was $82,990.00). See Tab J, Center for Workforce Analysis, Occupational Employment Projections in Pittsburgh MSA for Transportation, Storage, and Distribution Managers.  Despite the fact that substantially equivalent employment was available, Borrelli stated in his deposition that he made no genuine effort to find alternative employment after he was terminated by Triad in August 2004. See Tab K, Borrelli Dep. at pp. 287-288 ("So to answer your question, did I go look for another job[?]  **No I did not**.").  The first time that Borrelli recalled applying for any job occurred in February 2006, a full 18 months after he was terminated by Triad.  See Tab L, Borrelli Dep. Ex. 21 (internet job applications).  Meanwhile, his expert, Jarrell, was adamant that individuals such as Borrelli must identify and pursue positions via professional networking, by scanning classified advertisements, or by attending job fairs.  See Tab E, Jarrell Depo. at 12:11-13:25.

Because substantially equivalent employment was and remains available in the Pittsburgh MSA, and Borrelli failed to pursue it, Jarrell's projection of lost wages 16 years into the future is inappropriate and contrary to the controlling law regarding mitigation.  Further, it demonstrates that Jarrell's assumptions (that Borrelli would even pursue and obtain substantially equivalent employment in 2009, and again in 2012) also were improper because there are no facts supporting those assumptions.

Third, Jarrell's methodology also was flawed because, as discussed, he assumed without support that the median rate for a *Warehouse Manager* job was $50,860.00.  In fact, as discussed, there are *no* occupational classifications in the Pittsburgh MSA relevant to Borrelli for which the median annual rate is $50,860.00.  See Tab I, BLS annual median wage, all occupational classifications, Pittsburgh MSA.  Thus, Jarrell's future cumulative loss figure, $237,236, derives

- 14 -

from the erroneous assumption that the median rate for a *Warehouse Manager* job was $50,860.00. That simply is not the case, and his methodology is therefore flawed.

For the foregoing reasons, Borrelli cannot carry his burden of satisfying the second prong of Rule 702. Jarrell's "technique or principle [is not] sufficiently reliable." Bauer, 564 F. Supp. 2d at 375. As a result, his testimony must be barred.

### 3. Jarrell has not Applied His Principles and Methods Reliably to the Facts of the Case When Formulating His Economic Loss Opinion

Finally, Borrelli cannot satisfy the third prong of Rule 702 by demonstrating that Jarrell has applied his principles and methods reliably to the facts of the case when formulating his latest economic loss opinion. An expert's opinion will be inadmissible if it results from the unreliable application of the methodology to the facts at hand. See Total Containment, 2001 WL 1167506 at *4-5 (testimony concerning lost profits lacked reliability due to the expert's failure to justify the selection of a particular year used to make calculations). Here, Jarrell ignored pertinent facts when he simply calculated the difference between Borrelli's Triad wages (grown at the rate of 3% per year) and Borrelli's expected wages (based on the assumptions that Borrelli will in 2009 obtain a job paying at the 25 percentile level for the job "*Warehouse Manager*" in the Pittsburgh MSA, then three years later in 2012 obtain a "*Warehouse Manager*" job that paid the median annual salary, each grown at the rate of 3% annually).

First, Jarrell admitted that he knew Borrelli was employed by Triad as Warehouse Manager of the Neville Island Warehouse, a job in which Borrelli supervised shift foremen, who were the first-line supervisors who directly supervised the workers on the respective shifts.[5] Jarrell further admitted that Borrelli's duties actually included coordinating activities across the three shifts and general planning. See Tab E, Jarrell Depo. at 31:6-32:10 and 32:23-33:1. Yet,

---

[5] See footnote 4.

when Jarrell selected an occupational classification and corresponding wage data, he chose an occupational classification that applies to first-line supervisors (which Borrelli was not) and most closely applied to dockmasters, gas station managers and roadmasters (jobs Borrelli never worked for Triad).  Id. at 29:5-17.

Additionally, Jarrell was not even aware of occupational classification 11-3071, which identifies *Warehouse Manager* as an example of a job that fits within the classification, and for which the annual median wage is $82,990.  Id. at 34:5-15.  Borrelli's Warehouse Manager duties placed him within this occupation and, as Jarrell admits, had Borrelli obtained a job in this occupational classification at the median rate, he would immediately be making more than he made at Triad.  The same holds true if Borrelli obtained such a job paying only in the 25th percentile, or $63,720.  See id. at 39:14-21 and 39:24-40:21; Tab H, BLS 25th percentile annual salary for Transportation, Storage, and Distribution Managers, Pittsburgh MSA.

Second, as discussed, the facts do not support an assumption that Borrelli will pursue any job, given his deficient mitigation efforts to date even though substantially equivalent employment has been available.  Thus, it was inappropriate for Jarrell to assume that Borrelli would pursue and obtain jobs in 2009 and 2012.  The facts do not support such assumptions.  Third, as discussed, the facts do not support Jarrell's assumption that $50,860.00 is the median annual salary for a *Warehouse Manager* job.  In light of the foregoing, it is clear that Jarrell has not reliably applied his methodology to the facts.  Rather, Jarrell ignored key facts and, as a result, should not be permitted to testify regarding future economic loss.

**C.      The Court Should Exclude Jarrell's Testimony That Borrelli was Perceived as Being Disabled from 2,020 Warehouse Manager Jobs**

**1.      Again, Jarrell's Opinion is not Based on Sufficient Facts or Data**

The Court also should exclude Jarrell's opinion and testimony that Triad perceived Borrelli as being disabled from some 2,020 *Warehouse Manager* jobs because Jarrell's opinion is not "based on sufficient facts or data." Fed R. Evid. 702(1). First, Jarrell just pulled numbers "from the internet" (see Tab Q, Center for Workforce Analysis, Occupational Employment Projections in Pittsburgh MSA for First-Line Supervisors); there is no evidence that he conducted some analysis and made some determination that there were other 2,020 jobs in the local community that had similar responsibilities to Borrelli's Triad job. Second, as discussed, Jarrell did not use job projection data that specifically relates to the job "*Warehouse Manager*" in the Pittsburgh MSA. Rather, as Jarrell admits, he selected job projection data relating to "first-line supervisors" such as "Dockmaster, Gas Station Manager, [and] Roadmaster." See Tab E, Jarrell Depo. at 29:5-17; Tab F, SOC Dictionary. This, despite the fact that Borrelli was not employed in those capacities. Id. at 31:6-32:10 and 32:23-33:1.

Third, Jarrell was unaware of the data that most appropriately applies to Borrelli's circumstance, specifically occupational classification 11-3071 that listed "*Warehouse Manager*" as an illustrative job. See Tab F, SOC Dictionary. And Jarrell ignored the fact that typical duties related to this classification are identical to those that Jarrell concedes Borrelli performed as a Warehouse Manager for Triad. See Tab E, Jarrell Depo. at 31:6-32:10 and 32:23-33; Tab F, SOC Dictionary. Jarrell did not consider job classification 11-3071, or any job data related to it. Id. at 33:13-25.

In light of the foregoing, Borrelli cannot carry his burden of showing that Jarrell's testimony will be based upon sufficient facts or data. Jarrell's flawed data reflects only that there

PII-1190533v3

were 2,020 other "first-line supervisor" jobs (including dockmaster, gas station manager and

roadmaster jobs) in the Pittsburgh MSA.  Jarrell did not have "good grounds to rely on such data

in drawing conclusions."  Total Containment, 2001 WL 1167506 at *4.  As a result, the Court

should bar Jarrell's testimony.

> **2.      Jarrell's Opinion is not the Product of
>           Reliable Principles and Methods**

The Court also should exclude Jarrell's opinion because it is not the product of reliable

principles and methods.  In fact, Jarrell never "made [any] determination that there were other

jobs in the local community that had similar responsibilities" to Borrelli's former Triad job,

which was the basis for this Court's preliminary ruling that Jarrell's opinion was admissible.

See Motion Tab B, Oct. 9, 2008 Hearing Transcript at 46:13-47:12.  As discussed, Jarrell pulled

"from the internet" job projection data related to a job classification covering first-line

supervisors (Tab Q), then misled the Court by stating that his data related to the job *Warehouse

Manager*.  It did not.  See Tab E, Jarrell Depo. at 23:23-24:8 and 28:1-5.  Further, Jarrell never

considered the occupational classification that expressly listed "*Warehouse Manager*" as an

illustrative example.  Id. at 33:13-25.  As a result,  Borrelli cannot carry his burden of satisfying

the second prong of Rule 702, and his flawed opinion about Borrelli being perceived as disabled

from "2,020 *Warehouse Manager* jobs in this area" must be barred.

> **3.      Jarrell has not Applied His Principles and
>           Methods Reliably to the Facts of the Case**

Lastly, Borrelli again cannot satisfy the third prong of Rule 702 by demonstrating that

Jarrell has applied his principles and methods reliably to the facts of the case when formulating

his opinion that Borrelli "would be regarded as disabled from *2,020 Warehouse Manager jobs* in

this area."  Jarrell knew Borrelli was employed by Triad as Warehouse Manager of the Neville

Island Warehouse and supervised first-line supervisors.[6]  Jarrell knew that Borrelli's duties actually included coordinating activities across the three shifts and general planning.  See Tab E, Jarrell Depo. at 31:6-32:10 and 32:23-33:1.  Yet, when Jarrell selected an occupational classification and corresponding job projection data, he chose an occupational classification that applies to first-line supervisors (which Borrelli was not).  Id. at 29:5-17.  Additionally, Jarrell was not even aware of occupational classification 11-3071, which identifies *Warehouse Manager* as an example of a job that fits within the classification.  Id. at 34:5-15.

## CONCLUSION

Due to the glaring deficiencies of Jarrell's methodology and data, and Jarrell's disregard of pertinent facts, Borrelli cannot demonstrate that Jarrell's testimony would satisfy any of the three prongs required by Rule of Evidence 702.  Thus, all of Jarrell's remaining testimony must be excluded.

---

[6] See footnote 4.

Dated:  January 30, 2009

/s/ James S. Urban
Roy A. Powell, Esq. (Pa. Bar No. 37487)
Amy E. Dias, Esq. (Pa. Bar No. 52935)
James S. Urban, Esq. (Pa. Bar No. 82019)
JONES DAY
500 Grant Street, Suite 3100
Pittsburgh, PA  15219-2502
Telephone:  (412) 391-3939
Facsimile:  (412) 394-7959
Email:  rapowell@jonesday.com
         aedias@jonesday.com
         jsurban@jonesday.com

Counsel for Defendant, Metal Traders, Inc.,
d/b/a Triad Metals International

PII-1190533v3